UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.

DAVID MIDDENDORF, et al.,

                Defendants.

Case No. 18 Cr. 36 (JPO)

**JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS DAVID MIDDENDORF, THOMAS WHITTLE,
<u>AND DAVID BRITT'S MOTION TO DISMISS THE INDICTMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

I.  The Conspiracy to Defraud the United States Count Fails to State an Offense. ......................2

   A.  Count One Violates *Tanner* and *Pirro* by Failing to Allege a Conspiracy Targeted at Impeding any Lawful Government Function of the SEC. ...............................................2

   B.  Count One Does Not Allege a "Fraud" on the SEC. ...........................................................5

   C.  Count One Is Unconstitutionally Vague. ...........................................................................11

II.  The Wire Fraud Counts Fail Because the PCAOB Information at Issue Here Is an Intangible Regulatory Interest, Not "Money or Property."............................................12

   A.  *Cleveland* Squarely Controls. ..........................................................................................12

   B.  *Carpenter* Is Inapposite to the PCAOB's Regulatory Information. ..................................17

   C.  The Clear Statement Concerns in *Cleveland* Are Equally Present in the Government's Interpretation of "Property." ........................................................................19

   D.  The Indictment's Focus on "Use" Is Unconstitutionally Vague and Confirms That the PCAOB's Interest Is Regulatory, Not Property. ..........................................................20

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States,*
484 U.S. 19 (1987)................................................................................17, 18, 19

*Chiarella v. United States,*
445 U.S. 222 (1980)........................................................................................7

*Cleveland v. United States,*
531 U.S. 12 (2000)................................................................................ *passim*

*Dennis v. United States,*
384 U.S. 855 (1966)......................................................................................11

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010)................................................................1, 13, 14, 16

*Hammerschmidt v. United States,*
265 U.S. 182 (1924)..................................................................................6, 11

*Ingram v. United States,*
360 U.S. 672 (1959)........................................................................................4

*Johnson v. United States,*
135 S. Ct. 2551 (2015)..............................................................................11, 12

*Marinello v. United States,*
138 S. Ct. 1101 (2018)........................................................................12, 19, 20

*Russell v. United States,*
369 U.S. 749 (1962)....................................................................................3, 8

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018)..............................................................................11, 12

*Skilling v. United States,*
561 U.S. 358 (2010)......................................................................................11

*Tanner v. United States,*
483 U.S. 107 (1987)..............................................................................2, 4, 6, 11

*United States v. Adkinson,*
158 F.3d 1147 (11th Cir. 1998) ......................................................................4

*United States v. Ballistrea*,
    101 F.3d 827 (2d Cir. 1996)..................................................................................9

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991).............................................................................10

*United States v. Buck*,
    No. 13 CR 0282 (VM), 2017 WL 4174931 (S.D.N.Y. Aug. 28, 2017)..................................10

*United States v. Connolly*,
    No. 16 Cr. 370 (S.D.N.Y. Mar. 29, 2018) (ECF No. 203).......................................5

*United States v. Conover*,
    722 F.2d 765 (11th Cir. 1985) ............................................................................6

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012)............................................................................7, 10

*United States v. Czubinski*,
    106 F.3d 1069 (1st Cir. 1997).......................................................................18, 19

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)...........................................................................8, 9

*United States v. Fowler*,
    932 F.2d 306 (4th Cir. 1991) ...........................................................................18

*United States v. Grossman*,
    843 F.2d 78 (2d Cir. 1988)..........................................................................17, 18

*United States v. Gurary*,
    860 F.2d 521 (2d Cir. 1988)......................................................................4, 5, 10

*United States v. Hedaithy*,
    392 F.3d 580 (3d Cir. 2004).............................................................................15

*United States v. Murphy*,
    809 F.2d 1427 (9th Cir. 1987) ...........................................................................7

*United States v. Nersesian*,
    824 F.2d 1294 (2d Cir. 1987).........................................................................7, 9

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000)..........................................................3, 4, 5, 6, 8, 10

*United States v. Rodriguez-Davalos*,
    No. EP-10-CR-2159-KC, 2011 WL 5509542 (W.D. Tex. Nov. 10, 2011) ............................16

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977)................................................................................2

*United States v. Schwartz*,
    924 F.2d 410 (2d Cir. 1991)...........................................................................17

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007)............................................................................10

*United States v. Stringer*,
    730 F.3d 120 (2d Cir. 2013).........................................................................5, 8

*United States v. Zarrab*,
    No. 15 CR 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ...................10

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)...........................................................................5

**Statutes**

15 U.S.C. § 7211(b) .........................................................................................13

15 U.S.C. § 7212(a) .........................................................................................14

15 U.S.C. § 7214 ........................................................................................14, 18

15 U.S.C. § 7214(g) ..........................................................................................4

18 U.S.C. § 371 ................................................................................................6

18 U.S.C. § 641 ..............................................................................................18

**Other Authorities**

Brief of Appellant, *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997) (No.
    96-1317), 1996 WL 33659010...........................................................................19

Indictment, *United States v. Internet Research Agency LLC*,
    18 Cr. 32 (D.D.C.) (ECF No. 1) .......................................................................25

## INTRODUCTION

The Government argues that this case is nothing more than a run-of-the-mill application of settled law.  It is anything but.  The Indictment's unprecedented charges do not allege, as they must, what the fraud on the SEC was or that the PCAOB's confidential regulatory information is property covered by the wire fraud statute.  These are fundamental legal flaws, not failures of proof, and cannot be remedied by the inflammatory rhetoric or extra-Indictment allegations that appear throughout the Government's opposition brief.

The Government does not meaningfully contend with controlling legal precedent.  Instead, by starting from the presumption that the alleged conduct must be a federal crime and working backwards to justify these novel theories of liability, both the Indictment and the Government's brief contradict decades of Supreme Court and Second Circuit case law.  The Government also ignores the considered decision of Congress to commit enforcement of the PCAOB's ethics code to the ample civil and administrative penalties prescribed in Sarbanes-Oxley.

Along the way, the Government mischaracterizes the Defendants' arguments in order to set up straw men to knock down.  For instance, the Government accuses the Defendants of making "inherently self-contradictory arguments" about the PCAOB's regulatory nature (Opp. at 1), but fails to even cite the Supreme Court opinion that determined that the PCAOB is a unique public-private entity that exercises sovereign power even though it is not part of the "United States."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484-86, 503, 508 (2010) (holding that while the PCAOB is not part of the "United States Government" for certain statutory purposes, it is "the regulator of first resort and the primary law enforcement authority" for the accounting industry and "wield[s] the executive power of the United States").

The Government's silence on *Free Enterprise* is indicative of its broader approach. Instead of explaining how the Indictment pleads the essential elements of the crimes charged, the Government effectively suggests that no indictment can ever be dismissed pretrial. But that is not the law. For the reasons stated previously and elaborated further below, every count in the Indictment fails to state a federal offense. The Indictment should therefore be dismissed.

## I. The Conspiracy to Defraud the United States Count Fails to State an Offense.

### A. Count One Violates *Tanner* and *Pirro* by Failing to Allege a Conspiracy Targeted at Impeding any Lawful Government Function of the SEC.

For Count One, the Government argues that the Indictment need only "track the statutory language of the defraud clause." Opp. at 15-16. The Government is wrong. The Second Circuit has "reject[ed] the argument that the phrase 'conspiracy to defraud the United States' is sufficient, without more, to define the 'central' nature of the conspiratorial plan." *United States v. Rosenblatt*, 554 F.2d 36, 41 (2d Cir. 1977). Rather, "when the government proceeds under the conspiracy-to-defraud clause it must *plead* and prove an agreement with respect to the essential nature of the alleged fraud." *Id.* at 42 (emphasis added) (footnote omitted).

The Government has failed to meet that burden here. The Indictment fails to allege the "most important[]" element of a *Klein* conspiracy: an agreement *targeted* at impeding a lawful function of the federal government. *Tanner v. United States*, 483 U.S. 107, 130 (1987). Instead, it charges a conspiracy to misappropriate confidential information from the PCAOB to affect PCAOB inspection outcomes, with mere knowledge that the SEC received and used those reports for undefined purposes. Indictment ¶ 91. Knowledge is not purpose, and, as *Tanner* explains, defrauding an intermediary like the PCAOB that is supervised by a federal agency, even assuming some impact on the agency, is not sufficient to state the offense. J. Br. at 12-13.

The Indictment's statutory allegations do not state what the SEC does with PCAOB inspection reports that the Defendants targeted their agreement at impeding.  *See* Indictment ¶ 91 (impeding the SEC's "regulatory and enforcement functions").  Elsewhere, the Indictment describes SEC functions such as "oversee[ing] the operations of the PCAOB," *id.* ¶ 10, and "monitor[ing] Auditor quality," *id.* ¶ 11.  But the statutory allegations fail to connect these various functions to an alleged *agreement* by the Defendants to defraud a lawful function of the SEC by affecting PCAOB inspection outcomes.  J. Br. at 14-15.  Instead, the grand jury's Indictment allows the Government to fill in the blank for this "most important" element.

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), explains why this point is not, as the Government contends, merely a dispute over proof, but instead mandates dismissal.  There, the indictment charged the defendant with submitting a false statement in a tax return.  *Id.* at 89.  The charge was based on a failure to disclose another person's "ownership interest" in properties.  *Id.* at 89, 94.  But the tax laws required disclosure of "shareholders" only, not those with an "ownership interest."  The Second Circuit affirmed the dismissal of the charge, explaining that by alleging the defendant failed to disclose an "ownership interest," the indictment alleged conduct that "might not" have been criminal and risked conviction based on facts that the grand jury had not found.  *Id.* at 93-95.

Similarly here, to ensure that the Defendants are "tried on the evidence presented to the grand jury" and "that the grand jury acted properly," the Indictment must specify what lawful function of the SEC the Defendants targeted their agreement at impeding.  *Pirro*, 212 F.3d at 92-93; *accord Russell v. United States*, 369 U.S. 749, 767-69 (1962) (indictment must provide sufficient detail to ensure that the legal theory is valid).  It does not.  Without that necessary specificity, the Indictment alleges conduct that might not be criminal under the statute.  *Pirro*,

212 F.3d at 93.  If, for example, the grand jury indicted the Defendants for conspiring to impede the SEC's "regulatory and enforcement functions" based on the allegation that the SEC "oversee[s] the PCAOB inspections process," Indictment ¶ 10, then the grand jury indicted the Defendants on *exactly* the supervisory theory that *Tanner* held is not a conspiracy to defraud the United States.  *See Tanner*, 483 U.S. at 131-32.

The Indictment also does not allege that the conspiracy's purpose was to impede an SEC function.  *Pirro* again shows why this requires dismissal.  There, the Second Circuit held that if an element "is not necessarily implied" from the indictment, it fails to state an offense.  212 F.3d at 94-95.  Here, knowledge does not necessarily imply purpose—especially where the "to wit" clause identifies a *different* purpose: misappropriating PCAOB information to affect PCAOB inspection outcomes.  Indictment ¶ 91; *see United States v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998) (finding "most troublesome … that the indictment alleges … that the purpose of the conspiracy in this case was bank fraud").  By contrast, in *United States v. Gurary*, 860 F.2d 521 (2d Cir. 1988), the Second Circuit held that a jury could have reasonably inferred an intent to defraud targeted at the IRS where the defendants knew that making false statements on tax returns to the IRS was "part and parcel" of a broader scheme such that the scheme could not succeed without it.  *Id*. at 525.  Here, the success of the scheme against the PCAOB is not alleged to be dependent on the required sending of PCAOB inspection reports to the SEC, which by statute the PCAOB is also required to transmit to state regulatory agencies and to make available to the public.  15 U.S.C. § 7214(g).

"A conspiracy, to be sure, may have multiple objectives."  *Ingram v. United States*, 360 U.S. 672, 679 (1959).  But while obstructing a government function need not be "the primary objective" of a *Klein* conspiracy, it must nevertheless be "one of its objectives."  *Id*. at 679-80;

*accord Gurary*, 860 F.2d at 525 (although impeding the government "may be incidental to another primary motivation," the defendants must have "intended to impede or obstruct" the government).  Under *Tanner* and *Pirro*, it is not sufficient to allege mere knowledge that the SEC received PCAOB inspection reports; rather, the Indictment must allege that the Defendants made impeding an SEC function the *target* or objective of their conspiracy.  Count One therefore fails.

### B.    Count One Does Not Allege a "Fraud" on the SEC.

In addition to failing to allege that the Defendants targeted their conduct at impeding a lawful function of the SEC, Count One fails for a second reason: Nowhere does the Indictment state what the "fraud" *on the SEC* was.  "Fraud in the air" is not sufficient to charge a federal criminal offense.  *United States v. Connolly*, No. 16 Cr. 370, slip op. at 20 (S.D.N.Y. Mar. 29, 2018) (ECF No. 203) (McMahon, C.J.) (citing *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 (2d Cir. 2016)).  As cases like *Tanner* and *Coplan* make clear, a defraud clause charge here must allege an agreement to transmit a false statement to the SEC or violate a duty owed to the SEC, either directly or through an intermediary.  *See* J. Br. at 15-18.  The Indictment fails to do so.  And the Government's opposition brief compounds the Indictment's failure by misstating the Defendants' arguments and the law, relegating critical cases like *Coplan* to a mere footnote in its brief.  *See* Opp. at 20 n.4.

"Fraud is a term of art at law."  *Connolly*, slip op. at 8.  Conduct may colloquially be described as "unethical," "dishonest," or "cheating," but none of these is a synonym for "fraud."  *Id.* at 7.  Accordingly, because "fraud" is a generic legal term, an indictment alleging fraud must identify the specific fraudulent conduct.  *See Pirro*, 212 F.3d at 92-93 (in an omission case, an indictment must specify the omission and "allege what made the omission … criminal"); *United States v. Stringer*, 730 F.3d 120, 126-27 (2d Cir. 2013) (indictments rooted in false statements

must "specif[y] … what statements are alleged to be false, and in what respect they are false"). Alleging in conclusory fashion that a defendant used "dishonest means," Indictment ¶ 91, does not protect a defendant from being tried on evidence different than that presented to the grand jury.  *See Pirro*, 282 F.3d at 92.  Nor does this kind of vague language permit a court to evaluate whether the alleged conduct is fraudulent as a matter of law.  *Id.* at 93.

In the *Klein* conspiracy context, the allegedly agreed-to fraudulent conduct must satisfy two requirements.  First, the fraudulent act must reach the government, either directly or through an intermediary.  Second, the fraudulent act must consist of either a false statement or a violation of a duty owed to the government.  *See* J. Br. at 15-17.  The first requirement flows from the text of the statute and is confirmed by Supreme Court precedent.  Section 371 makes it a crime to conspire "to defraud *the United States*."  (emphasis added).  Impeding a lawful government function is not by itself a fraud on the United States.  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  What transforms mere obstruction into a fraud on the United States is deceitful means that actually reach the United States.

In *Tanner*, for example, the defendant breached his fiduciary duties *to his employer*, the intermediary, in a number of ways.  483 U.S. at 110-12.  Although these breaches of fiduciary duty were "fraudulent" and impeded the REA's interest in "seeing that [REA programs were] administered honestly," *United States v. Conover*, 772 F.2d 765, 771 (11th Cir. 1985), *rev'd sub nom. Tanner*, 483 U.S. 107, the Supreme Court rejected that theory of liability.  483 U.S. at 129-132.  The only way the convictions could survive on remand, the Supreme Court held, was under the alternate theory charged in the Indictment that the defendants caused the company to submit false certifications to the REA.  *Id*. at 132.  Under *Tanner*, a *Klein* conspiracy requires not only an agreement to *target* the United States, it requires *fraudulent conduct that reaches the United*

*States*, there, false statements.  The Government has not identified, and the Defendants are not aware of, a single case upholding a *Klein* conspiracy where the allegedly agreed-to fraudulent conduct would not reach the government, either directly or through an intermediary.

The second requirement—a false statement or violation of a duty owed to the government—is simply another way of stating that the conduct alleged must be *fraud*.  For example, it is well settled that omissions are not fraudulent absent a duty to disclose.  *See Chiarella v. United States*, 445 U.S. 222, 235 (1980).  Consequently, there is no fraud, and can be no *Klein* conspiracy liability, for withholding information one has no obligation to disclose to the government—or for causing another to withhold the same.  *See United States v. Murphy*, 809 F.2d 1427, 1431-32 (9th Cir. 1987); *United States v. Nersesian*, 824 F.2d 1294, 1311-12 (2d Cir. 1987).

The Second Circuit relied on this element in *United States v. Coplan*, where it reversed the convictions of two of the defendants who had not agreed to submit false statements or violate a duty to disclose withheld materials.  703 F.3d 46, 64 (2d Cir. 2012) (observing that "the IRS [n]ever requested copies" of withheld materials and "governing ethical standards [did not] require[] E&Y to disclose those materials in the absence of such a request").  Under *Coplan*, withholding information one has no duty to disclose fails to state a defraud clause offense.

In light of these cases, the Indictment does not state a *fraud* on the SEC.  First, it fails to allege any fraudulent conduct that reached the SEC.  The fraudulent means specified in the Indictment is misappropriating information from the PCAOB.  The Government implies that this conduct is sufficient to satisfy the deceitful means element.  Opp. at 19, 22.  But this conception of defrauding the United States by defrauding an intermediary—the PCAOB—fails to satisfy the requirement of *Hammerschmidt* and *Tanner* that the fraud reach the United States.

The only part of the Indictment that even hints at a fraud reaching the SEC are five words in the statutory allegations: "fraudulently affect PCAOB inspection outcomes."  Indictment ¶ 91. But this conclusory language does not allege what fraudulent conduct reached the SEC.  For example, it does not state that the Defendants agreed to cause the PCAOB to make false statements to the SEC or to fail to disclose required information to the SEC.  *See also* J. Br. at 15-20.  The Indictment fails to specify even the basic category of fraudulent conduct, much less point to a particular statement or action that was false, fraudulent, or misleading.  *Pirro*, 212 F.3d at 92-93; *Stringer*, 730 F.3d at 126-27.

Attempting to explain what fraud the grand jury charged, the Government claims that the PCAOB "would unwittingly provide the SEC with a false and misleading view as to the integrity of the inspections or the quality of KPMG audits."  Opp. at 19-20.  This, the Government argues, "compromised the integrity of a statutorily imposed regulatory regime that the SEC is vested with the responsibility of overseeing and enforcing."  Opp. at 21.

There are two problems with this theory of "fraud."  First, this formulation adds new information that is not in the Indictment.  *See Russell*, 369 U.S. at 770.  The Government's attempt to add substance to the Indictment's allegations is effectively an acknowledgment that the allegations are insufficient and shows the Government will try a different case than what was presented to the grand jury.  *See Pirro*, 212 F.3d at 92; J. Br. at 19 (discussing other possible interpretation of "fraudulently affect").

More fundamentally, this addition still fails to specify any false or misleading statement or fraudulent omission made to the SEC.  Like the Indictment's language, it is focused on an alleged misleading impression rather than a specific fraudulent statement or omission in the PCAOB inspection reports.  *Finnerty* makes clear that this fails to establish "fraud."  *United*

*States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008).  There, the Government's theory was that the defendant engaged in "non-verbal deceptive conduct" by "giv[ing] the victim a false impression" that he was not engaged in "interpositioning," a practice prohibited by NYSE rules.  *Id.* at 148. The Second Circuit acknowledged that customers might expect that interpositioning would not occur.  Nevertheless, the Second Circuit held that acting contrary to customers' expectations is not fraudulent "unless their understanding was based on a statement or conduct" by the defendant.  *Id.* at 150.  As in *Finnerty*, both the Indictment and the opposition brief fail to identify what statement or violation of a duty—either by the Defendants or by the PCAOB— defrauded the SEC into a misimpression about the quality of KPMG audits as a whole.

Instead of addressing these flaws, the Government mischaracterizes the Defendants' argument, stating that the "Second Circuit has repeatedly rejected the defendants' argument that … the Government must show that *the defendant owed a direct duty of disclosure* to the relevant government agency."  Opp. at 17-18 (emphasis added) (citing *Nersesian*, 824 F.2d 1294, and *United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996)).  The Defendants do not contend that a defendant must breach a duty he *directly* owes to the Government.  To the contrary, the opening brief acknowledges that *Nersesian* and *Ballistrea* hold that one can conspire to defraud the United States by causing an *intermediary* to breach a duty it owes to the government—and that is all those cases hold.  J. Br. at 16 (also citing, inter alia, *Nersesian*, 824 F.2d at 1311 (defendants caused the *bank* to violate its duty to report to the IRS)); *see also id.* at 18 n.1 (noting that *Ballistrea*, 101 F.3d at 832, held that "actual contact between the defendant and the Government" was not necessary under § 371 where defendants instructed salespeople to defraud the FDA).  But regardless of who will submit the false statement or breach a duty—the defendants themselves or an intermediary like in *Tanner* and *Nersesian*—for a *Klein* conspiracy

there must be an agreement to submit a false statement or breach a duty *to the United States*.  *See United States v. Shellef*, 507 F.3d 82, 105 (2d Cir. 2007) ("Just as the *Nersesian* defendants could be convicted for misrepresenting the true nature of their transactions to a third party *who owed an independent duty to the IRS*, so can [the defendants]." (emphasis added)).  No case cited by the Government holds otherwise.[1]

And while the Government attempts to manufacture a Circuit split between the Ninth Circuit and the Second Circuit (Opp. at 19), *Coplan* shows there is no split:  In the Second Circuit, the Government most prove an agreement to submit false statements or violate a duty to the United States to sustain a defraud clause charge.  *Coplan*, 703 F.3d at 64.  As *Pirro* explains, if evidence of a false statement or breach of a duty is what separates criminal from non-criminal conduct, as *Coplan* holds, then it must be charged by the grand jury.  *Pirro*, 212 F.3d at 91-92, 95.  If it does not, the appropriate remedy is dismissal of the indictment.  *Id.*[2]

The Government contends that it can charge defendants with conspiring to defraud the United States without defining the fraud on the United States.  But, as *Tanner*, *Coplan*, and years of precedent on "fraud" make clear, the allegedly false, misleading, or fraudulent conduct is an

---

[1] *See United States v. Bilzerian*, 926 F.2d 1285, 1298, 1302 (2d Cir. 1991) (fraud on the SEC by violating duty to file Schedule 13D forms); *Gurary*, 860 F.2d at 525 (fraud on the IRS by submitting false statements); *United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at *3-4 (S.D.N.Y. Oct. 17, 2016) (fraud on Treasury by violating duty to block transactions under OFAC regulations); *United States v. Buck*, No. 13 CR 0282 (VM), 2017 WL 4174931, at *3, 6 (S.D.N.Y. Aug. 28, 2017) (fraud on the IRS by submitting false tax returns).

[2] Perhaps recognizing the unsoundness of its novel position, the Government cites the Russia case to support its unprecedented argument that a "fraud" on the United States does not require a false statement or breach of a duty to the United States.  *See* Opp. at 19 n.3 (citing *United States v. Internet Research Agency LLC*, 18 Cr. 32 (D.D.C.)).  But the Russia indictment only proves the Defendants' argument.  It carefully alleges false statements and violations of duties to the United States for each agency allegedly defrauded.  *See* Indictment, *Internet Research Agency*, ¶¶ 1, 7, 25-27, 30, 48, 51 (ECF No. 1) (alleging defendants (1) violated duty to report campaign expenditures to the FEC; (2) violated duty to register as foreign agents under FARA with the DOJ; and (3) submitted false statements on visa applications to the State Department).

essential element of a fraud offense.  Accordingly, because the Indictment does not specify the fraud on the SEC, Count One must be dismissed.

### C.       Count One Is Unconstitutionally Vague.

Independent of these pleading failures, the Indictment rests on an unconstitutionally vague legal theory.  Although the Supreme Court has upheld defraud clause convictions in limited circumstances, it has repeatedly denounced efforts to expand the reach of the statute. *See, e.g.*, *Tanner*, 483 U.S. at 131-32; *Dennis v. United States*, 384 U.S. 855, 860 (1966); *Hammerschmidt*, 265 U.S. at 186.  And the Court has not reconsidered the scope of the defraud clause in the wake of seminal fraud and vagueness cases like *McNally*, *Skilling*, and *Johnson*.

The Court has also never considered a charge like this one.  *See Johnson v. United States*, 135 S. Ct. 2551, 2560 (2015) (noting "that the life of the law is experience," which revealed the statute was unconstitutionally vague).  *Klein* conspiracies are already unmoored from the common-law conception of fraud as limited to schemes to obtain *property*.  The Indictment here is divorced even further from any understanding of fraud, dispensing with a targeted purpose, required by *Tanner*, and fraud directed at the government in the form of a lie or breach of a duty, required by *Coplan*.  Accordingly, even on an as-applied basis, without these elements, it is impossible for the Defendants or others to know what "bad" or "unethical" conduct with some impact on the government will be deemed to defraud the United States.  *See Skilling v. United States*, 561 U.S. 358, 420 (2010) (Scalia, J., concurring in the judgment); *see also Johnson*, 135 S. Ct. at 2560-61 (vagueness can be adjudicated as a facial or as-applied challenge).

Shortly after the Defendants filed their motion, the Supreme Court found the definition of "crime of violence" in the immigration laws unconstitutionally vague.  *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).  Observing that "[v]ague laws invite arbitrary power," Justice Gorsuch, who cast the deciding vote, explained that "legislators may not abdicate their responsibilities for

setting the standards of the criminal law," as doing so "threaten[s] to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions."  *Id*. at 1223, 1227-28 (Gorsuch, J., concurring) (internal quotation marks, citations, and brackets omitted); *Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (invoking "lack of fair warning and related kinds of unfairness" to construe generic criminal statute narrowly).

"No amount of staring at the statute's text, structure, or history will yield a clue" as to the proper limits of *Klein* conspiracies.  *Dimaya*, 138 S. Ct. at 1232 (Gorsuch, J., concurring). Stretched as it has been here, the defraud clause fails to provide "fair notice" for when conduct affecting a third party will be treated as a criminal fraud on the United States, thereby "invit[ing] arbitrary enforcement."  *Johnson*, 135 S. Ct. at 2556; *Marinello*, 138 S. Ct. at 1108-09.

## II.     The Wire Fraud Counts Fail Because the PCAOB Information at Issue Here Is an Intangible Regulatory Interest, Not "Money or Property."

### A.     *Cleveland* Squarely Controls.

The Supreme Court made clear in *Cleveland* that intangible regulatory interests that derive from the government's sovereign authority are not the proper subject of a wire fraud prosecution, even if there is an analogous private intangible interest that could be considered "property."  531 U.S. 12, 23-24 (2000).  Although arising in the context of a state licensing scheme, *Cleveland* is not limited to licenses:  It establishes a functional test for courts to determine whether a claimed intangible right is "property" or is merely a regulatory interest.  On every relevant factor set forth in *Cleveland*, the PCAOB's intangible interest in protecting the confidentiality of its inspections process is plainly a regulatory interest, not property.  J. Br. at 29-32.  *Cleveland* squarely controls this case and requires dismissal of Counts Two through Five.

12

The Government's arguments to the contrary—which mischaracterize the nature of the PCAOB and misconstrue the Supreme Court's opinions in *Cleveland* and *Carpenter*—are unavailing.

The Government's opposition does not address the *Cleveland* factors at all. Instead, the Government seeks to transform *Cleveland*'s functional test into a formal test based solely on the legal structure of the entity allegedly defrauded. Because Congress created the PCAOB as a private corporation, the Government argues, "*Cleveland*'s concerns about sovereignty and the exercise of government power are inapplicable." Opp. at 33. But the Government's contention that the PCAOB is merely a "private entity," "cannot exercise sovereign power" and "is not a government regulator" (Opp. at 29, 33-35) is directly contradicted by the Supreme Court's decision in *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010).

In *Free Enterprise*, the Supreme Court considered whether and how Article II's Appointments Clause applies to the PCAOB. Notwithstanding Congress's decision to remove the PCAOB from the "United States Government" for certain statutory purposes, the Court determined that the PCAOB is "the regulator of first resort and the primary law enforcement authority" for the accounting industry and "wield[s] the executive power of the United States." *Id.* at 484-86, 503, 508; *see also* J. Br. at 29-31.[3] Accordingly, the Court held that the PCAOB is subject to constitutional restrictions on legislative and executive power, including the Appointments Clause, and that the double for-cause removal protections of PCAOB Board members were unconstitutional. *Free Enter. Fund*, 561 U.S. at 492. Notably, the Government

---

[3] The Government oddly suggests that Congress was "clear" that the PCAOB "cannot exercise sovereign power" because Sarbanes-Oxley says: "The Board shall not be an agency or establishment of the United States Government, and, *except as otherwise provided in this Act*, shall be subject to, and have all the powers conferred upon a nonprofit corporation …." Opp. at 33 n.11 (quoting 15 U.S.C. § 7211(b)) (emphasis added). The italicized "except" clause, of course, refers to the rest of Sarbanes-Oxley that is the very source of the sovereign power Congress conferred on the PCAOB at issue in *Free Enterprise* and in this case.

there *conceded* that Board members are "Officers of the United States who exercise significant authority pursuant to the laws of the United States." *Id.* at 485-86 (internal quotation marks and brackets omitted).

Here, however, the Government takes the contrary position, arguing that the PCAOB is a purely private entity, and that it would be "absurd" to acknowledge that the PCAOB is not part of the "United States" for § 371 purposes but recognize that it exercises sovereign regulatory authority conferred on it by Congress for other purposes. Opp. at 1, 34. *Free Enterprise* holds that it would be absurd not to. The Government's litigation position here is indefensible in failing to even mention *Free Enterprise*, let alone reconciling it with the Supreme Court's holding and the Government's concession there.

Even aside from *Free Enterprise*'s recognition that the PCAOB is a regulator that exercises the executive power of the United States, there is no basis in *Cleveland* for the Government's distinction between a "formal" government agency and a nongovernment entity acting in a regulatory capacity. *Cleveland* focused on *Louisiana*'s exercise of sovereign power through legislation: "In short, *the statute* establishes a typical regulatory program. It licenses … engagement in pursuits that private actors may not undertake without official authorization." *Cleveland*, 531 U.S. at 21 (emphasis added). The same is true here: Through Sarbanes-Oxley, Congress exercised its sovereign power to establish a "typical regulatory program," and created the PCAOB to administer it. This program is effectively a licensing scheme for public accounting firms—they cannot engage in the practice of public accounting unless they register with the PCAOB and submit to its statutorily mandated inspections. 15 U.S.C. §§ 7212(a), 7214.

And, like any other regulatory program, Congress set penalties for violations of its provisions, deciding to leave violations of the PCAOB ethics code to civil and administrative remedies.[4]

The PCAOB "did not decide to venture into the [audit inspection] business"; it was created by Congress for that express purpose. *Cleveland*, 531 U.S. at 24. Congress mandated that the PCAOB inspect auditing firms to uphold public trust in public accounting and the confidentiality of its inspection targets furthers that regulatory mission. J. Br. at 30. The Government acknowledges as much in its opposition. *See* Opp. at 1. For this reason, *Cleveland* provides that the PCAOB's right to keep the identity of its inspection targets confidential is not confidential business information; it is a quintessential regulatory interest.

Nevertheless, starting from its flawed premise that the PCAOB is a purely private entity, the Government makes three additional arguments for why *Cleveland* cannot apply to the PCAOB's confidential regulatory information. All three arguments fail.

First, the Government cites the Third Circuit's decision in *Hedaithy* for its unprecedented argument that *Cleveland* categorically does not apply to "non-state actors." Opp. at 33-34 (citing *United States v. Hedaithy*, 392 F.3d 580, 596-97 (3d Cir. 2004)). *Hedaithy* holds no such thing. Rather, as the Defendants explained in their opening brief (J. Br. at 34-35), the Third Circuit applied *Cleveland*'s functional test and determined that a private testing company, ETS, had a property interest in its "confidential business information"—the TOEFL test—because it was "*in the business of administering the TOEFL exam*," "provides a service and reports test results *in pursuit of a profit-seeking endeavor*," "has no sovereign power to regulate," its "power to issue score reports … rests squarely on its ownership of the 'ETS' trademark and copyrights," and it "can sell its 'licensing authority' to others." *Id.* at 596, 600 (emphasis added). If the

---

[4] As the Court knows, the SEC has initiated an administrative proceeding against the Defendants.

Government were correct that all that matters under *Cleveland* is whether the entity in question is public or private, there would have been no reason for the Third Circuit to engage in the *Cleveland* analysis. And conducting that same analysis here—which the Government does not even attempt—shows that the PCAOB's interest in its confidential inspection information is purely regulatory. J. Br. at 29-32.

Second, the Government suggests that recognizing the application of *Cleveland* to the PCAOB "could exclude a wide swath of not-for-profit entities and their confidential information from the protections of the wire fraud statute, including other self-regulatory organizations like FINRA and state and local bar associations." Opp. at 34. But *Cleveland* has no impact on non-profit entities that do not exercise regulatory or sovereign power. Just like for-profit entities, ordinary non-profits hold "property" under *Cleveland*: they do not exercise regulatory authority; they compete in the marketplace to advance their missions; their power to hold information confidential rests not on sovereign authority but on assets such as trademarks and goodwill; and they are free to, and do, sell those assets or information to others. Nothing about this case impacts those entities. And while self-regulatory organizations may have a mix of interests, courts are capable of applying *Cleveland*'s functional test to cases that are closer to the line than this one. *See, e.g.*, *United States v. Rodriguez-Davalos*, No. EP-10-CR-2159-KC, 2011 WL 5509542, at *3-4 (W.D. Tex. Nov. 10, 2011) (holding the Export Import Bank, a federal agency, has a "property" interest in its loan guarantees); *see also Free Enter. Fund*, 561 U.S. at 503 (distinguishing regulatory character of the PCAOB from self-regulatory organizations).

Finally, implicitly acknowledging the deficiencies in the Indictment, the Government argues that the PCAOB has a property interest in its regulatory information because the Government intends to prove *at trial* that the PCAOB "expends significant resources to create its

inspections lists."  Opp. at 37-38.  This improper argument, if accepted, would eviscerate *Cleveland*.  Everything the government does requires the expenditure of "resources."  The Second Circuit has already rejected as "patently absurd" the notion that resources expended transform an intangible regulatory interest into a "property" interest.  *See United States v. Schwartz*, 924 F.2d 410, 417-18 (2d Cir. 1991) (licenses are not "tangible property" simply "because they have a physical existence").  And *Cleveland* rejected an even clearer example of the government's financial interest in a regulatory scheme, holding that the processing fees Louisiana received for licensing applications did not change the regulatory nature of protecting the integrity of its poker licenses.  *Cleveland*, 531 U.S. at 21-22.

B.     *Carpenter* **Is Inapposite to the PCAOB's Regulatory Information.**

Instead of addressing *Cleveland* on its merits, the Government overreads *Carpenter* in an attempt to save the wire fraud counts, to no avail.  The opinion in *Carpenter* cites a variety of sources in its discussion of confidential *business* information, all focused on information derived from and used in private enterprise.  *Carpenter v. United States*, 484 U.S. 19, 26 (1987); *see also* J. Br. at 33-34.  And in *Cleveland*, the Supreme Court cast *Carpenter*'s holding narrowly.  It explained that *Carpenter* reaffirmed *McNally*'s holding that mail and wire fraud "protects property rights only," but upheld the convictions there because, "[c]iting decisions of this Court as well as a corporate law treatise, we observed that '[c]onfidential *business* information has long been recognized as property.'"  *Cleveland*, 531 U.S. at 19 (emphasis added) (quoting *Carpenter*, 484 U.S. at 26).  There is no authority similarly describing confidential *regulatory* information as long recognized as property.  J. Br. at 31-32 & n.4.

The Government nevertheless presses its argument by citing the Second Circuit's decision in *Grossman* to argue that despite *Carpenter*'s repeated use of the phrase "confidential business information," *Carpenter* describes just one *type* of "confidential information" protected

17

by the wire fraud statute.  Opp. at 31, 36 (citing *United States v. Grossman*, 843 F.2d 78, 86 (2d

Cir. 1988)).  This misunderstands *Grossman*.  There, the defendant argued that, unlike the *Wall*

*Street Journal* in *Carpenter*, the law firm from which he stole confidential client information was

not in the business of creating and exploiting that client information by selling and publishing it.

*Grossman*, 843 F.2d at 85-86.  The Second Circuit rejected this attempt to limit *Carpenter* to its

facts, holding that it was "confidential business information" both of the client who created it and

also of the law firm, because confidentiality had "commercial value" to the firm to "protect or

enhance the firm's reputation, with the result that it would not lose its clients."  *Id.* at 86.

        In other words, *Grossman* hews to *Carpenter*'s restriction to confidential *business*

information and does not support the Government's broader interpretation.  And, as the

Defendants explained in their opening brief, unlike the law firm in *Grossman*, the PCAOB does

not protect the confidentiality of its inspections lists to "enhance its reputation" in order to attract

accounting firms to retain its services and agree to be inspected; those firms are required by law

to submit to inspections.  J. Br. at 35; 15 U.S.C. § 7214; Indictment ¶¶ 4, 8.

        The Government next argues that regulatory information in the hands of the federal

government should be considered "property" under the wire fraud statute.  Opp. at 35-37.  But

the support the Government cites for this position are two inapposite out-of-circuit cases decided

before *Cleveland*.[5]  Even if they were on point, *Cleveland*'s subsequent holding compels the

---

[5] The Government claims that the Fourth Circuit's decision in *United States v. Fowler*, 932 F.2d
306 (4th Cir. 1991), "cited *Carpenter* for the principle that [government] information constitutes
property under Section 1343."  Opp. at 35.  It did not.  *Fowler* analogized to *Carpenter* to hold
that classified government information is a "thing of value of the United States" under 18 U.S.C.
§ 641, a statute the Defendants here are not accused of violating.  932 F.2d at 310.  And in the
First Circuit's decision in *United States v. Czubinski*, the defendant never argued that
confidential government information could not be "property" under the wire fraud statute;
instead, he argued—successfully—that his mere "browsing" of confidential information did not

conclusion that confidential regulatory information is a regulatory interest that is not "property" within the meaning of the wire fraud statute.

In sum, the Indictment's attempt to extend *Carpenter* is foreclosed by *Cleveland*. It is telling that the Government cannot identify a *single* opinion post-*Cleveland* applying *Carpenter* to nonpublic regulatory information. This Court should not be the first.

### C. The Clear Statement Concerns in *Cleveland* Are Equally Present in the Government's Interpretation of "Property."

In *Cleveland*, the Supreme Court noted that it would violate clear statement principles to interpret the state licenses as "property" because it would upset the federal-state balance by making a vast array of state-policed conduct—i.e., state licensing schemes—a federal crime. *Cleveland*, 531 U.S. at 24-25. The same is true here. There is no basis to distinguish between the PCAOB's intangible interest in the confidentiality of its regulatory information and the interest of any state or local entity in protecting the same. *See* J. Br. 37-38. Allowing the Government to bypass Congress's decision to make a violation of the PCAOB ethics code a civil, not criminal, offense in favor of the blunt instrument of wire fraud in the absence of a clear statement from Congress undermines the enforcement structure of Sarbanes-Oxley. J. Br. 3-6. In addition, the Government's interpretation of the wire fraud statute would disrupt a detailed regulatory scheme setting different penalties for dissemination of different kinds of Government information. J. Br. at 39-40; *see Marinello*, 138 S. Ct. at 1108.

---

defraud the IRS of any property right. 106 F.3d 1069, 1072-76 (1st Cir. 1997) (reversing conviction); *see also* Brief of Appellant, *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997) (No. 96-1317), 1996 WL 33659010, at *16 (conceding that "[c]onsistent with *Carpenter* … government 'property' … includes confidential information over which the government has the exclusive use or control"). The court's acceptance of the unchallenged premise that confidential regulatory information was "property" is therefore mere dicta. 106 F.3d at 1074.

The Government does not respond to these arguments; it merely notes that because the PCAOB is not a federal agency, these issues are not implicated in this case. Opp. at 29 n.7, 47. That misses the point. By expanding "property" in the wire fraud statute to include confidential regulatory information, the Indictment's theory necessarily violates these clear statement principles. This Court should reject the Government's assault on *Cleveland* and *McNally*.

> **D.    The Indictment's Focus on "Use" Is Unconstitutionally Vague and Confirms That the PCAOB's Interest Is Regulatory, Not Property.**

The Indictment's theory that "*using*" information before it is disclosed by the PCAOB to KPMG deprived the PCAOB of property by frustrating its inspections process, *see* Indictment ¶¶ 97, 99, 101, shows that the interest in protecting the confidentiality of that information is regulatory in character, not property. The Indictment's premise—that using the information undermines the regulatory integrity of the PCAOB's inspections process—violates both *Cleveland* and *McNally*. Thus, accepting the Government's interpretation of property would create a shifting and vague theory of criminal liability whose validity would turn on whether the property interest is viewed through the lens of "obtaining" or "using" the PCAOB's information.

The Government argues in response that its shifting theory of "property" is relevant only to its ability to prove its case at trial and that the scheme it charges is "straightforward." Opp. at 46. But if the grand jury based the Indictment on "using" the information to deprive the PCAOB of the integrity of the inspections process, then the Indictment's shifting theory of fraud veers into "honest services" fraud that is not within the permissible scope of the wire fraud statute. Whether viewed as a direct vagueness challenge or a matter of statutory interpretation, *see Marinello*, 138 S. Ct. 1108-09, this illegitimate theory cannot proceed to trial.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Indictment in its entirety.

Dated:  May 24, 2018
        New York, New York

/s/* Nelson A. Boxer
Nelson A. Boxer
Amy Lester
Alexandra R. Clark
  PETRILLO KLEIN &
BOXER LLP
655 Third Avenue
22nd Floor
New York, NY  10017
Tel: (212) 370-0330
nboxer@pkbllp.com

Gregory S. Bruch
Khiran Sidhu (*pro hac vice*)
  BRUCH HANNA LLP
1099 New York Avenue NW
Suite 500
Washington, DC  20001
Tel: (202) 969-1630

*Attorneys for Defendant David Middendorf*

Respectfully submitted,

/s/ Robert M. Stern
Melinda Haag (*pro hac vice*)
Robert M. Stern
Matthew R. Shahabian
Alyssa Barnard
  ORRICK, HERRINGTON &
SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
Tel: (212) 506-5000
mhaag@orrick.com

*Attorneys for Defendant David Britt*

/s/* Bradley J. Bondi
Bradley J. Bondi
Nola B. Heller
Sean P. Tonolli (*pro hac vice*)
  CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY  10005
Tel: (212) 701-3000
bbondi@cahill.com

*Attorneys for Defendant Thomas Whittle*

*Signed with the consent of counsel