**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 82556 / January 22, 2018

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 3918 / January 22, 2018

**ADMINISTRATIVE PROCEEDING**
File No.  3-18346

| | |
|---|---|
| **In the Matter of**<br><br>CYNTHIA HOLDER, CPA,<br>JEFFREY WADA, CPA,<br>DAVID MIDDENDORF, CPA,<br>THOMAS WHITTLE, CPA, and<br>DAVID BRITT, CPA<br><br>**Respondents.** | ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, AND NOTICE OF HEARING |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Cynthia Holder, CPA; Jeffrey Wada, CPA; David Middendorf, CPA; Thomas Whittle, CPA; and David Britt, CPA (collectively, "Respondents"), pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice.[2]

---

[1]  Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]  Rule 102(e)(1)(ii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found to be lacking in character or integrity or to have engaged in unethical or improper professional conduct.

## II.

After an investigation, the Division of Enforcement and the Office of the Chief Accountant allege that:

## SUMMARY

1. This case involves the unauthorized disclosures of confidential information from the Public Company Accounting Oversight Board ("PCAOB" or "Board") relating to its Inspections program, and a concerted effort by the proposed respondents to use that information to benefit KPMG LLP and, consequently, themselves.

2. On his last day at the PCAOB in 2015, Brian Sweet took sensitive inspections-related documents from the PCAOB to use as a resource in his new job in KPMG's Department of Professional Practice. Shortly after he joined KPMG, Sweet asked Cynthia Holder, then a PCAOB employee, to send him confidential PCAOB materials. She did as he requested, then sent him additional confidential information relating to a planned inspection of a KPMG client. Holder made these unauthorized disclosures while she was seeking employment at KPMG. In 2016 and 2017, a third PCAOB employee, Jeffrey Wada, leaked confidential information relating to the PCAOB's planned inspections of KPMG to Holder after she had left the PCAOB and joined KPMG. Wada's leaks to Holder in 2017 similarly occurred while he was seeking employment with KPMG.

3. Most of the information Sweet, Holder, and Wada disclosed without authorization related to the PCAOB's inspections of KPMG audits, including the audit engagements the PCAOB planned to inspect, the criteria the PCAOB used to select engagements for inspection, and the focus areas of the inspections. This was valuable information to KPMG, which had experienced a high rate of audit deficiency findings and had made a priority of improving its PCAOB inspection results.

4. Sweet told his supervisors in KPMG's National Office, David Middendorf and Thomas Whittle, along with another partner in that office, David Britt, that he had taken confidential materials from the PCAOB and received, from time to time, additional confidential information from PCAOB employees. Middendorf and Whittle encouraged Sweet to share the PCAOB's confidential information with them, with other KPMG colleagues, and with an outside contractor. After Wada sent Holder the list of the PCAOB's planned inspections for 2016, Middendorf, Whittle, Britt, Sweet, and Holder undertook an effort to analyze and review audit

---

Rule 102(e)(1)(iii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

2

workpapers and to suggest revisions to them to avoid possible findings of deficiencies by the PCAOB.

5.      Middendorf, Whittle, Britt, Sweet, and Holder also received from Wada confidential information relating to the PCAOB's upcoming 2017 inspections. However, their misconduct came to light early in the year and did not affect any PCAOB inspections of the firm.

## RESPONDENTS

6.      <u>Cynthia Holder</u>, 51, of Houston, Texas was an Executive Director in KPMG's Department of Professional Practice group from August 2015 until April 2017. Prior to joining KPMG, Holder was an Inspections Leader at the PCAOB from December 2011 until August 2015. Holder is licensed as a CPA in Texas.

7.      <u>Jeffrey Wada</u>, 42, of Tustin, California was an Inspections Leader at the PCAOB from February 2012 until February 2017. Wada is licensed as a CPA in California.

8.      <u>David Middendorf</u>, 53, of Marietta, Georgia, was KPMG's National Managing Partner for Audit Quality and Professional Practice until April 2017. Middendorf is licensed as a CPA in Georgia, New York, and Ohio and was previously licensed in Texas.

9.      <u>Thomas Whittle</u>, 54, of Gladstone, New Jersey, was KPMG's National Partner-In-Charge for Inspections until April 2017. Whittle is licensed as a CPA in New York and New Jersey and was previously licensed in Pennsylvania and Connecticut.

10.     <u>David Britt</u>, 54, of New Canaan, Connecticut, was KPMG's Banking and Capital Markets Group Co-Leader until February 2017. Britt is licensed as a CPA in New York and California and was previously licensed in the District of Columbia.

## OTHER RELEVANT PERSON AND ENTITY

11.     <u>Brian Sweet</u>, 40, of Fresno, California, was a Partner in KPMG's Department of Professional Practice group until March 2017. Prior to joining KPMG, Sweet was an Associate Director in the PCAOB's inspections group from March 2014 until April 2015. Sweet is licensed as a CPA in New York and Illinois and was previously licensed in California. The Commission has charged Sweet for his role in the misconduct described in this Order.

12.     <u>KPMG LLP</u> is a Delaware limited liability partnership and PCAOB-registered accounting firm. Headquartered in New York, New York, KPMG is the U.S. member firm of KPMG International Cooperative, a Swiss entity.

## FACTS

### The PCAOB's Inspections Process

13.     The PCAOB was created as part of the Sarbanes-Oxley Act of 2002 to oversee the audits of public companies that are subject to the securities laws in order to protect the interests of

3

investors and further the public interest in the preparation of informative, accurate, and independent audit reports.

14.     One of the critical ways in which the PCAOB fulfills this mission is by inspecting audits of public companies conducted by registered public accounting firms.  Through these inspections, the PCAOB assesses the audit firms' compliance with the statutes, regulations, and professional standards governing the accounting profession.  The PCAOB typically selects the audit engagements it will inspect based on confidential internal analysis and thereafter notifies firms which audits it will inspect.  The PCAOB typically issues inspection reports, only parts of which are made public, after all the inspections for a firm are complete.

15.     To ensure the integrity of the inspection process, the PCAOB closely guards the confidentiality of both its inspection targets prior to firm notification and its methodology for selecting those targets.  All PCAOB employees must certify that they are complying with PCAOB Ethics Rules that prohibit employees from using confidential PCAOB information for private gain (or even merely creating the appearance that they are) and that bar them from making unauthorized disclosures of confidential information obtained during their employment.  The PCAOB's Ethics Rules and the employees' ethics certifications state these prohibitions continue to apply even after their employment with the Board ends.

### KPMG's Pursuit of Sweet

16.     In September 2014, the PCAOB issued a report regarding its 2013 inspections of KPMG audits.  The report found that out of 50 audits the PCAOB inspected, 23 were deficient.  This 46 percent deficiency rate, which placed KPMG third among the "big four" accounting firms, reflected a significant decline from KPMG's 34 percent deficiency rate the previous year.  As a result, KPMG leadership exerted meaningful pressure within the firm to improve the results.  One of the steps KPMG took to improve its results was to hire Sweet, an Associate Director at the PCAOB who worked on the team inspecting KPMG audits, to join the firm.  KPMG's Vice Chair of Audit characterized Sweet's recruitment as a "top priority."

17.     KPMG hired Sweet as a partner in the Department of Professional Practice ("DPP") group in the firm's National Office.[3]  Among other things, Sweet was responsible for conducting internal inspections of KPMG audits.

### Sweet Divulges Confidential PCAOB Information to KPMG

18.     In April 2015, shortly before leaving the Board, Sweet copied from an internal PCAOB database to his office computer various confidential inspection-related materials he believed might help him at KPMG.  On his last day at the Board, Sweet transferred these documents and the other files on his PCAOB computer to a personal hard drive that he took with him.  Sweet also took from the PCAOB hard copy documents and retained confidential PCAOB documents he had previously brought home.

---

[3]     KPMG's National Office is responsible for technical accounting and auditing leadership, risk management, and quality control for the firm.

19.     These documents included PCAOB inspection planning information, inspection guides and manuals, and drafts of confidential inspection comment forms. The planning materials included the confidential list of KPMG audit engagements the PCAOB intended to inspect in 2015, the focus areas for each inspection, and a list of all the quantitative and qualitative criteria the Board used in deciding which KPMG audit engagements to inspect.

20.     Upon joining KPMG in May 2015, Sweet transferred the PCAOB documents from his personal hard drive to his computer at the firm.

A.      Sweet Divulges Confidential PCAOB Information Regarding 2015 Inspections to Middendorf, Whittle, and Britt

21.     At KPMG, Sweet reported to Thomas Whittle, who was responsible for overseeing both the PCAOB's and KPMG's internal inspections. Whittle, in turn, reported to David Middendorf, who oversaw the National Office's audit quality and professional practice work.

22.     On his first day at the firm in May 2015, Sweet had lunch with Middendorf and other KPMG National Office colleagues, including David Britt, another National Office partner who was co-leader of KPMG's Banking and Capital Markets Group. During the lunch, Sweet's new colleagues asked him various questions about the PCAOB's inspections of KPMG. One of the questions Middendorf asked Sweet was whether the PCAOB intended to inspect a specific KPMG banking client that year. Without answering directly, Sweet indicated the PCAOB planned to do so.

23.     Several days later, Whittle asked Sweet to provide him the list of the PCAOB's planned inspections for 2015.[4] Sweet showed Whittle a hard copy of a PCAOB inspection planning document that identified 46 KPMG audits the PCAOB intended to inspect that year and included the PCAOB's confidential areas of focus for those inspections.

24.     The next day, Whittle emailed Sweet, asking him to have an assistant "scan and send me the banking selection list" (i.e. KPMG's bank holding company clients the PCAOB had selected for inspection). Sweet complied by sending Whittle the complete list of planned inspections and asked Whittle to exercise discretion given the nature of the information. Whittle replied, "got it and understand the sensitivity." Whittle forwarded this information to Middendorf the same day, writing, "The complete list. Obviously, very sensitive. We will not be broadcasting this."[5]

25.     In June 2015, Sweet identified for Britt a number of KPMG banking clients the PCAOB planned to inspect in 2015. The next day, Britt emailed Sweet, "I thin[k] when we were

---

[4]     By that time, the PCAOB had informed KPMG of less than half of the audit engagements it intended to inspect in 2015.

[5]     Though Whittle immediately assigned Sweet to review the workpapers of one of the inspection targets, it does not appear that any workpapers were changed in response to Sweet providing the 2015 inspection list. At the time Sweet provided this information to Middendorf and Whittle, KPMG had, pursuant to its policy, locked the audit workpapers for all but two of the engagements from editing absent special circumstances.

5

going through the list of Bank selections, you couldn't recall the last 3 Bank names without your notes, would you be able to get me the last three for 2015." Sweet gave Britt the information later that day, asking him to "please note there is some sensitivity with these, and some of the teams have not yet been officially notified by the PCAOB, so please use your discretion with this info."

26. Sweet shared the information he had taken from the PCAOB with his new colleagues to benefit himself and the firm. He believed, based on comments Middendorf and Whittle had made to him, that his position as a partner at KPMG was not secure. Sweet believed it would help him in his position at KPMG if he were perceived as a team player working to help the firm.

B.     <u>Middendorf and Whittle Direct Sweet to Divulge Confidential PCAOB Information to An Outside Consultant</u>

27. In April 2015, KPMG engaged an outside consultant to help it predict which audit engagements the PCAOB would inspect in 2016. In June 2015, Middendorf and Whittle both approached Sweet in his office and directed him to share everything he knew with the outside consultant. Sweet understood this to be an instruction to give the consultant all of the information he took from the PCAOB.

28. Sweet complied with Middendorf and Whittle's directive by providing information about the Board's selection criteria to a KPMG colleague, who then gave that information to the consultant. In September 2015, Sweet spoke directly with the consultant and gave them additional confidential information regarding the inspections selection process.[6] At the end of September, Sweet reported to Middendorf and Whittle that he had "spent quite a bit of time with [the outside consultant] trying to guide their modeling efforts."

C.     <u>Sweet Divulges Confidential PCAOB Information to Others</u>

29. Sweet also used the confidential information he had taken from the PCAOB in other ways. In August 2015, Sweet informed a KPMG National Office colleague that the PCAOB was unlikely to inspect certain engagements in 2016. Sweet wrote, "I checked my old planning notes and can confirm that [four KPMG audit clients] are NOT on the PCAOB's planning radar. They don't have any of them included in the issuer count, so it is fairly safe to say those have a very remote chance of ever being evaluated for inspection!"

30. In April 2016, Sweet provided confidential PCAOAB information to an audit partner preparing a client pitch for a Spanish bank's audit business.[7] Sweet sent the partner confidential PCAOB comment forms related to the Board's inspection of another Spanish bank,

---

[6]     Among other things, Sweet explained how the PCAOB's Inspections group used confidential information received from the Board and the SEC.

[7]     The Spanish bank's auditor was rotating off pursuant to the European Union's mandatory audit firm rotation rules. Securing this audit business was a global priority for KPMG (which marketed its banking expertise) as a result of recent failures to win the audit business of several other large multinational banks.

6

writing that he had attached "some examples of the types of issues that have been raised in the past. I hope this helps!" The comment forms discuss specific ways in which that bank's auditor had failed to adequately test the valuation of its allowance for loan loss.

### Holder Divulges Confidential PCAOB Information to KPMG

31. After KPMG offered Sweet a position at the firm, Whittle asked Sweet for a list of PCAOB employees whom KPMG should consider recruiting. Before he left the PCAOB, Sweet had discussed with Cynthia Holder, a friend who was then a PCAOB Inspections Leader, the prospect of her joining him at KPMG. On Sweet's first day at KPMG (May 4, 2015), he informed Holder that he would be meeting with Whittle to push for the firm to hire her. On May 11, 2015, Sweet told Holder he was going to hand-deliver her resume to Whittle and "make a sell again" in person.

32. On May 12, 2015, Sweet asked Holder to send him a confidential PCAOB document reflecting comments he had written about KPMG's audits while he was at the Board. At that time, KPMG personnel were preparing for a meeting with the PCAOB to discuss the firm's performance on its audits, during which KPMG would make a presentation on the root causes of the firm's audit failures. Sweet asked Holder for a document he had written while he was at the PCAOB so he could review it before helping his KPMG colleagues prepare that presentation. That day, Holder sent Sweet the document he requested from her personal email account.

33. About two weeks later, Holder notified the PCAOB's ethics group that she had recused herself from any work related to KPMG in order to pursue employment at the firm.

34. On June 17, 2015, Holder again shared confidential PCAOB information with Sweet, telling him that the Board had decided to cancel its planned inspection of a KPMG audit client for 2015, and that the Board did not intend to replace it with another selection. Sweet immediately relayed this information to Whittle.

35. KPMG sent Holder an employment offer in July 2015. She joined the firm the following month as an Executive Director in DPP performing internal inspections and advising banking engagement teams on their audits.

### Wada Divulges Confidential PCAOB Information to KPMG in 2016

36. In early March 2016, Wada, an Inspections Leader at the PCAOB who had previously performed work on KPMG inspections but was then assigned to inspect another audit firm, learned that he had not been selected for a promotion. Wada reacted angrily, telling a colleague the PCAOB had "screwed" him by passing him over.

37. After learning he had not been selected for promotion, Wada accessed the PCAOB's confidential list of KPMG engagements the Board had selected for inspection in 2016

from an internal database of KPMG-related documents.[8]  Because Wada was no longer working on KPMG matters, he had no legitimate reason to access this information.

38.     On March 28, 2016, Wada, who remained friends with Holder after she left the PCAOB, called her and read to her the names of twelve KPMG clients the Board planned to inspect.[9]  Holder provided this information to Sweet, who then immediately relayed the list to Whittle, Middendorf, and Britt, informing them that it had come from a former colleague at the PCAOB.

### Use of Confidential PCAOB Information to Change KPMG Audit Workpapers

39.     Wada gave KPMG the list of the PCAOB's planned inspections at a critical time in two respects.

40.     First, in early February 2016, Middendorf and other members of KPMG's leadership team had met with staff from the SEC's Office of the Chief Accountant ("OCA"). During that meeting, OCA personnel expressed significant concerns about the firm's audit quality and questioned whether KPMG was adequately addressing these issues.  On the same day they received the list of inspection targets from Wada, Middendorf, Whittle, Sweet, and Britt discussed how to use the information.  Middendorf told the group his highest priority was to protect one of the efforts KPMG's National Office had instituted to improve audit quality from criticism.  As the PCAOB found an increasing number of audit deficiencies by KPMG beginning in 2013, KPMG created "monitoring programs" run by DPP that reviewed workpapers to ensure compliance with professional standards.[10]  One of these programs focused on the audits of certain banking clients' Allowances for Loan and Lease Losses ("ALLL").  KPMG created the ALLL monitoring program in 2015 in response to numerous deficiencies the PCAOB had identified in this area.  The success of the ALLL monitoring program was especially important to KPMG because the firm had promoted it as proof of the seriousness with which it was working to improve its audit quality.

41.     Second, Wada alerted KPMG to the PCAOB's planned inspections at a time when KPMG personnel were able to access and change audit workpapers.  Though KPMG had already issued audit reports for each of these engagements, KPMG was within the 45-day period in which KPMG's policy allowed audit teams to complete the administrative process of assembling the final audit file.  In general, KPMG could only perform certain clerical work during this period.  At the end of this 45-day period, KPMG locked audit workpapers from editing absent special circumstances.

---

[8]     When accessing the internal database, users are warned that they are accessing a restricted site that contains privileged information and that misuse of the information can lead to civil or criminal penalties.

[9]     Of the 12 clients, 10 were bank holding companies and 2 were other issuers that Wada appears to have thought were also bank holding companies.  It appears that Wada identified these engagements for Holder because her responsibilities at KPMG included advising banking engagement teams.

[10]    KPMG's monitoring programs included both "in flight" reviews (reviews conducted prior to the issuance of the audit opinion) and post-issuance programs that were intended to assess the engagement team's performance after its audit work was complete.

42. Recognizing that the workpapers had not yet been locked per KPMG's policy, Middendorf, Whittle, and Britt agreed to have Sweet and others conduct an additional examination of the audit workpapers for the seven banks on the list Wada had provided that were part of KPMG's ALLL monitoring program to determine whether anything could be done to minimize the risk that the PCAOB would find deficiencies in those audits.

43. Middendorf and Whittle instructed that no one in the briefing should disclose that they had obtained confidential PCAOB information.

44. To provide cover for their project, Britt told others at KPMG that they were performing work in the ordinary course of business on all 35 banking engagements in the firm's ALLL monitoring program. On March 28, 2016, Britt sent the engagement partners for these audits an email stating that, as part of the "wrap up and reporting of the results" of the ALLL program, DPP needed to gather "some additional information" from their audit workpapers.[11]

45. Over the next few weeks, Sweet, Holder, and various partners and managing directors in DPP engaged in a review of the audit workpapers of the seven banks in the monitoring program that were on the list Wada provided. The DPP professionals suggested edits and proposed changes to the engagement teams, which then decided what changes to incorporate into the final audit workpapers.[12]

### Wada Divulges Confidential PCAOB Information to KPMG in 2017

46. In early January 2017, Wada provided Holder a "preliminary" list of PCAOB inspection targets for 2017. On January 9, Holder relayed the names of the clients on the list to Sweet, and together, they briefed Whittle. That night, Sweet, Whittle, and Britt discussed this information. After that meeting, Sweet, as instructed by Whittle, contacted the engagement partners for two of the audits on the January 2017 list to warn them about the potential inspections.

47. On January 10, Wada sent Holder his resume and a narrative of his work experience, writing, "I am now trying to sell myself to KPMG."

48. On February 2, Wada sent Holder two text messages in quick succession: first, "Okay, I have the grocery list," then "All the things you'll need for the year." The next day, he called Holder and read her a list of 47 ticker symbols that Holder understood to be the final list of 2017 inspections. Wada also provided Holder the inspection focus areas for the banks on the list (as well as for another KPMG engagement), and the PCAOB's list of KPMG engagement partners with "poor performance evaluations."

---

[11] Britt also asked a subordinate in the National Office to conduct his own secret review of one KPMG client's audit workpapers.

[12] Middendorf, Whittle, Sweet, and Britt had agreed that Sweet would lead a team of DPP professionals to review the workpapers of the banks in the monitoring program, and that Middendorf, Whittle, and Britt would handle the other five issuers on the list they received from Wada.

9

49.     Holder relayed the information to Sweet, who then shared it with Middendorf, Whittle, and Britt.  Whittle instructed Sweet to warn certain engagement partners about the impending inspections.  Though Whittle had warned Sweet to be circumspect in how he communicated this to KPMG colleagues, Sweet's notice to one KPMG engagement partner caused her to suspect that the firm may have received confidential PCAOB information.  KPMG began to investigate these issues after its Office of General Counsel learned of her concerns.

50.     During the initial stage of KPMG's investigation, Sweet and Holder agreed to conceal how they learned of the PCAOB's 2017 inspection targets.[13]  They agreed to tell investigators that Holder had received a list of ticker symbols by mail with no return address or other identifying information.  Sweet then created a document consisting solely of the ticker symbols, which he provided to KPMG attorneys after they interviewed him.

51.     Holder destroyed evidence during KPMG's investigation.  KPMG attorneys asked Holder to provide them her phone so they could analyze whether there were relevant documents.  Before providing her phone to the firm, Holder deleted her texts with Wada.

## VIOLATIONS

52.     As a result of the conduct described above, Holder and Wada willfully violated PCAOB Ethics Code Section EC3, which prohibits PCAOB staff from acting in a manner which might reasonably result in or reasonably create the appearance that the employee is using confidential information obtained through service for the Board for the private gain of any person.

53.     As a result of the conduct described above, Holder and Wada willfully violated PCAOB Ethics Code Section EC9, which prohibits PCAOB staff from disseminating or otherwise disclosing any information obtained in the course and scope of his or her employment, and which has not been released, announced, or otherwise made available publicly.

54.     As a result of the conduct above, Holder willfully violated PCAOB Rule 3500T, which requires members to maintain integrity when performing any professional service in connection with the preparation or issuance of any audit report.

55.     As a result of the conduct described above, Middendorf, Whittle, and Britt willfully violated PCAOB Rule 3500T, and willfully aided and abetted and caused Sweet's violations of Sections EC3 and EC9.

56.     As a result of the conduct above, Holder, Wada, Middendorf, Whittle, and Britt are lacking in integrity and/or engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

---

[13]     Holder told Sweet that she had sworn to Wada she would never identify him as the source.

### III.

In view of the allegations made by the Division of Enforcement and the Office of the Chief Accountant, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A. Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B. Whether pursuant to Section 21C of the Exchange Act, Respondent Holder should be ordered to cease and desist from committing or causing violations of, and any future violations of, PCAOB Ethics Code Sections EC3, EC9, and PCAOB Rule 3500T;

C. Whether pursuant to Section 21C of the Exchange Act, Respondent Wada should be ordered to cease and desist from committing or causing violations of, and any future violations of, PCAOB Ethics Code Sections EC3 and EC9;

D. Whether pursuant to Section 21C of the Exchange Act, Respondents Middendorf, Whittle, and Britt should be ordered to cease and desist from committing or causing violations of, and any future violations of, PCAOB Rule 3500T and PCAOB Ethics Code Sections EC3 and EC9;

E. Whether pursuant to Sections 21(B)(e) and 21C(e) of the Exchange Act, Respondents Holder, Wada, Middendorf, Whittle, and Britt should be ordered to pay disgorgement;

F. Whether pursuant to Section 21(B)(a)(2) of the Exchange Act, Respondents Holder, Wada, Middendorf, Whittle, and Britt should be ordered to pay a civil penalty; and

G. Whether pursuant to Section 4C of the Exchange Act and Section 102(e) of the Commission's Rules of Practice, Respondents Holder, Wada, Middendorf, Whittle, and Britt should be censured or denied, temporarily or permanently, the privilege of appearing or practicing before the Commission as an accountant.

### IV.

IT IS ORDERED that a public hearing for purposes of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondents as provided for in the Commission's Rules of Practice.

IT IS FURTHER ORDERED that, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice, 17 C.F.R. § 201.360(a)(2), the Administrative Law Judge shall issue an initial decision no later than 120 days from the occurrence of one of the following events: (A) The completion of post-hearing briefing in a proceeding where the hearing has been completed; (B) Where the hearing officer has determined that no hearing is necessary, upon completion of briefing on a motion pursuant to Rule 250 of the Commission's Rules of Practice, 17 C.F.R. § 201.250; or (C) The determination by the hearing officer that a party is deemed to be in default under Rule 155 of the Commission's Rules of Practice, 17 C.F.R. § 201.155 and no hearing is necessary.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

                                                Brent J. Fields
                                                Secretary